**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

STATE OF WEST VIRGINIA, *ex rel.*
JOHN B. MCCUSKEY, Attorney General,

*Plaintiff,*

v. Civil Action No. ___________

PENNSYLVANIA PUBLIC UTILITY COMMISSION;
STEPHEN DEFRANK, in his official capacity
as Chairman of the Pennsylvania Public
Utility Commission; and KIMBERLY
BARROW, in her official capacity as Vice
Chairman of the Pennsylvania Public
Utility Commission,

*Defendants.*

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of West Virginia, *ex rel.* John B. McCuskey, Attorney General, brings this action against the Pennsylvania Public Utility Commission ("PUC"), and the PUC officials responsible for implementing and enforcing Pennsylvania's Alternative Energy Portfolio Standards Act, as amended by Act 40 (2017) and Act 114 (2020), to vindicate the constitutional rights of West Virginia, its energy producers, its ratepayers, its citizens, and itself under the Commerce Clause of the

United States Constitution. The State seeks declaratory and injunctive relief.

## BACKGROUND

1. The Commonwealth of Pennsylvania enacted Act 40 (2017) and Act 114 (2020) to wall off its alternative energy credit market from interstate competition, shutting out every out-of-state electricity generator from selling most types of credits into Pennsylvania. Pennsylvania law requires in-state electric distribution companies and electric generation suppliers to meet alternative energy standards by either obtaining a percentage of electricity from a qualifying alternative energy source or purchasing the same amount in Alternative Energy Credits ("AECs"). But, through Act 40 and Act 114, and their implementing regulations, Pennsylvania deliberately barred West Virginia's power generators, and every other out-of-state generator, from selling Tier I solar credits or Tier II credits into Pennsylvania.[1] The laws

[1] These refer to categories of qualifying alternative energy resources under Pennsylvania law, which are divided into two tiers: Tier I for wind, solar photovoltaic, low-impact hydropower, biomass, geothermal, and fuel cells, among others; and Tier II for waste coal, large-scale hydropower, municipal solid waste, distributed generation, and demand-side management, among others. *See* 73 P.S. § 1648.2

accomplish this through geographic eligibility criteria that require physical presence within Pennsylvania, notwithstanding the AEPS Act's original framework that allowed participation by any qualifying generator within the thirteen-state PJM Interconnection.

2. The Acts serve no legitimate environmental purpose, nor do they advance the welfare of Pennsylvania's citizens. To the contrary, they inflict direct economic harm on Pennsylvanians, whose electricity compliance costs have exploded—rising from $122.5 million in 2020 to more than $700 million in 2025—since Pennsylvania's Legislature and PUC artificially strangled the supply side of the energy credit market by locking out interstate competition.

3. Instead, the Acts were passed for one purpose: to protect in-state generators from out-of-state competition. The legislative sponsors did not disguise their intent. They titled their proposal "Closing Tier II Border." They declared their objective was to "close the borders." And they delivered what they promised. In 2020, about 40% of Pennsylvania's Tier II AECs (i.e., credits from waste coal, large-scale hydropower, municipal solid waste, and other Tier II resources) came from out-of-state generators. By 2024, about 97% came from within Pennsylvania and by

2025, that figure had reached 100%. The PUC's own annual data tracks the systematic eviction of out-of-state generators from a market they had participated in for more than fifteen years.

4. West Virginia and Pennsylvania are connected by PJM Interconnection, L.L.C., a regional transmission organization through which wholesale electricity flows seamlessly across state lines. Accordingly, many West Virginia energy producers could, would, and—until 2017—did sell AECs to Pennsylvania electricity suppliers. The harm to West Virginia from being boxed out of this market is staggering and growing. In 2025 alone, West Virginia generators lost the opportunity to obtain more than $25 million in credit revenues that would otherwise have flowed to the State's producers and, in turn, to its ratepayers and treasury.

5. And, over the next ten years, based on West Virginia's documented and projected generation—at prices published by Pennsylvania's own PUC, and against Pennsylvania's own statutory demand—Acts 40 and 114 will deny West Virginia generators more than $895 million in alternative energy credit revenue. More than $120 million of that total revenue would flow back to West Virginia families through

savings on electric bills, more than $36 million would flow to households and small businesses that own their own solar systems, and more than $50 million would go to the State, its counties, and its school boards in taxes. But because of Pennsylvania's laws, West Virginia citizens and energy producers, and the State itself, will lose substantial economic value.

6. The Framers included the Commerce Clause in our Constitution precisely to prevent this kind of naked economic warfare between states. *See* Art. I, § 8, Cl. 3. As courts have long recognized, the Clause prevents states from erecting barriers at their borders to shield in-state producers from the rigors of interstate competition, no matter how politically popular the protectionism may be at home. Yet Pennsylvania's legislators did precisely that, bragged about it in their co-sponsorship memoranda, celebrated it in joint statements with the PUC, and urged the PUC to interpret the statutes as restrictively as possible. West Virginia brings this action to tear down Pennsylvania's unconstitutional trade barriers and restore the interstate market that federal energy policy was designed to create.

## PUBLIC INTEREST

7. The Attorney General believes this action to be in the public interest of the citizens of the State of West Virginia and brings this lawsuit by his constitutional and statutory authority, powers, and duties.

8. West Virginia ratepayers are directly harmed by Pennsylvania's border-closing legislation. West Virginia is a fully regulated, vertically integrated electricity market. Its major utilities—Appalachian Power, Mon Power, and Potomac Edison—hold renewable energy credits on behalf of ratepayers, and they pass value directly to families through cost-of-service ratemaking. When West Virginia generators are blocked from selling credits into Pennsylvania, it is West Virginia families who lose.

9. West Virginia municipalities that own and operate hydroelectric generation facilities—including the City of New Martinsville, Summersville/Gauley River Power Partners, and AMP/Willow Island—are harmed by their exclusion from the Pennsylvania Tier II market.

10. West Virginia's growing solar industry, developing under its Senate Bill 583, is also stunted by Pennsylvania's unconstitutional trade

barriers. Passed in 2020, Senate Bill 583 created a program for electric utilities to expand their energy capacity by building large-scale solar facilities in West Virginia. Nonetheless, Act 40 blocks West Virginia solar producers from selling Tier I solar credits into Pennsylvania's Solar Renewable Energy Credit ("SREC") market, while Act 114 blocks West Virginia's hydroelectric and waste coal producers from selling Tier II credits. Both markets were open to West Virginia producers before Pennsylvania chose to "close the borders."

**PARTIES**

11. The State of West Virginia, by and through its Attorney General, brings this action in its sovereign capacity as *parens patriae* on behalf of its citizens, as well as in its own economic interest based on the loss of specific tax revenue. The Attorney General is the Chief Legal Officer of the State of West Virginia, charged with protecting the State, its general economy, and its residents from unlawful interference with interstate commerce. *See* W. Va. Code § 5-3-2.

12. Defendant Pennsylvania Public Utility Commission is an agency of the Commonwealth of Pennsylvania charged with administering, implementing, and enforcing Pennsylvania's Alternative

Energy Portfolio Standards Act. *See* 66 Pa. Cons. Stat. Ann. § 101 *et seq*. The PUC issued a Final Implementation Order for Act 40[2] and a Final Implementation Order for Act 114.[3] Those orders interpret and implement the challenged geographic eligibility restrictions and are the agency action through which the challenged statutory restrictions are applied to Pennsylvania's alternative energy credit markets.

13. Defendant Stephen DeFrank is the Chairman of the Pennsylvania Public Utility Commission. Defendant Kimberly Barrow is the Vice Chairman of the Pennsylvania Public Utility Commission. They are sued in their official capacities for prospective declaratory and injunctive relief. As PUC officials, they participate in, supervise, and are responsible for the ongoing implementation, administration, and enforcement of the AEPS Act, Act 40, Act 114, and the PUC implementation orders challenged in this action.

---

[2] Implementation of Act 40 of 2017, Docket No. M-2017-2631527, Final Implementation Order (May 3, 2018).

[3] Implementation of Act 114 of 2020, Docket No. M-2020-3023323, Final Implementation Order (May 6, 2021).

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution of the United States, specifically Article I, Section 8, Clause 3 (the Commerce Clause).

15. The Court has equity jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908), and may award injunctive relief under 28 U.S.C. § 1651 and declaratory relief under 28 U.S.C. § 2201(a).

16. Plaintiff seeks declaratory and injunctive relief to stop ongoing violations of the U.S. Constitution. The individual defendants are sued in their official capacities because they are charged with administering and enforcing the challenged statutory restrictions and PUC implementation orders.

17. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because Defendants operate and administer the challenged laws in this District, and a substantial part of the events giving rise to this action occurred here.

## FACTS

### A. The PJM Interconnection and the Federal Policy of Non-Discriminatory Wholesale Competition

18. PJM Interconnection, L.L.C. ("PJM") operates the electric transmission system—i.e., "grid"—for all or part of thirteen states[4] and the District of Columbia. PJM centrally dispatches generation and coordinates the movement of wholesale electricity across this vast, interconnected, multi-state region.[5]

19. Wholesale energy in PJM is interstate commerce because of the interconnected grid across numerous state lines. *See New York v. FERC*, 535 U.S. 1, 7 (2002) ("[I]n all but three States, any electricity entering a grid becomes part of a vast pool of energy moving in interstate commerce."); *see also FPC v. Fla. Power & Light Co.*, 404 U.S. 453, 458 (1972).

[4] Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

[5] *See* PJM Interconnection, L.L.C., About PJM, https://www.pjm.com/about-pjm; *see also* Fed. Energy Regulatory Comm'n, PJM, https://www.ferc.gov/industries-data/electric/electric-power-markets/pjm.

20. PJM was founded in 1927 as a power pool of three utilities serving customers in Pennsylvania and New Jersey.[6] It became a fully functioning Independent System Operator ("ISO") in 1996 and introduced competitive markets with bid-based pricing in 1997.[7] Over time, its footprint expanded to include utilities across thirteen states and the District of Columbia—including West Virginia.[8]

21. PJM's creation as an ISO was a direct result of federal policy mandating non-discriminatory access to wholesale electricity markets. In 1996, the Federal Energy Regulatory Commission ("FERC") issued Order No. 888, titled "Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities." FERC's goal was "to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers." Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by

---

[6] Fed. Energy Regulatory Comm'n, PJM, https://www.ferc.gov/industries-data/electric/electric-power-markets/pjm.

[7] PJM Interconnection, L.L.C., PJM History, https://www.pjm.com/about-pjm/who-we-are/pjm-history.

[8] PJM Interconnection, L.L.C., Territory Served, https://www.pjm.com/about-pjm/who-we-are/territory-served.

Public Utilities, Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 (1996).

22. Order No. 888 required all public utilities that own, control, or operate facilities used for transmitting electric energy in interstate commerce to file open-access non-discriminatory transmission tariffs containing minimum terms and conditions of non-discriminatory service. FERC also promoted the formation of ISOs to "ensure fair and non-discriminatory access to transmission services and ancillary services for all users of the system . . . independent of any individual market participant or any one class of participants." *Id.* at 21,596.

23. In 1999, FERC issued Order No. 2000, which encouraged the formation of Regional Transmission Organizations ("RTOs") to promote broader regional transmission planning, energy trading, and coordination. RTOs are non-profit entities designed to ensure non-discriminatory access to the grid, so that sellers and buyers of wholesale electricity can connect with ease and achieve competitive, fair, market-based prices. PJM became an RTO under this federal framework.

24. The federal policy underlying these orders is unambiguous that states may not balkanize the interstate wholesale electricity market.

FERC's regulations were designed to ensure that no transmission owner—and no state—could give preferential treatment to in-state generators at the expense of out-of-state competitors. *See* Order No. 888, 61 Fed. Reg. at 21,541; Regional Transmission Organizations, Order No. 2000, 65 Fed. Reg. 809, 810 (Jan. 6, 2000), FERC Stats. & Regs. ¶ 31,089 (1999). Pennsylvania's laws do exactly what a quarter-century of federal energy policy was designed to prevent: they partition the integrated PJM market along state lines, rewarding political geography over economic efficiency and environmental equivalence.

### B. Renewable Energy and Alternative Energy Credit Sales on the PJM

25. Within the PJM system, renewable energy credits ("RECs") and alternative energy credits ("AECs") function as tradeable certificates that track and verify the generation of electricity from qualifying renewable or alternative energy sources. A REC or AEC is issued for every megawatt-hour (MWh) of electricity generated and delivered to the grid from an eligible energy resource. Each certificate is assigned a

unique serial number and represents the legal property right to the renewable or alternative energy attributes of that generation.[9]

26. RECs and AECs are tracked through PJM's Generation Attribute Tracking System ("GATS"), a centralized electronic platform that creates, records, and tracks certificates as they are generated and traded.[10] GATS ensures that credits are not double-counted and provides state regulators with access to centralized reporting. Credits are traded independently—generators produce them, and utilities purchase them to satisfy their state renewable portfolio standard obligations.[11]

27. This system was designed to harness the efficiencies of interstate commerce. Alternative energy generated in West Virginia and delivered over the PJM grid creates the same benefit as if it were produced by a generator in Pennsylvania.[12] The credit itself represents the public benefit and is fungible across state lines.

---

[9] PJM-EIS, Generation Attribute Tracking System (GATS), https://www.pjm-eis.com/getting-started/about-GATS.aspx.

[10] *Id.*

[11] PJM Interconnection, L.L.C., GATS Fact Sheet, https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/gats-fact-sheet.pdf.

[12] PJM-EIS, GATS Operating Rules, https://www.pjm-eis.com/-/media/DotCom/pjm-eis/documents/gats-operating-rules.pdf.

### C. Pennsylvania's Alternative Energy Credit Market Was Open to Interstate Commerce Until 2017

28. In 2004, the Pennsylvania General Assembly enacted the Alternative Energy Portfolio Standards Act ("AEPS Act"), 73 P.S. §§ 1648.1–1648.8, which established Pennsylvania's alternative energy credit trading program. The AEPS Act was originally enacted as Act 213 of 2004 and is codified in Title 73 of the Pennsylvania Consolidated Statutes (Purdon's Statutes), Sections 1648.1 through 1648.8.

29. The AEPS Act has been amended several times—most relevantly by Act 35 of 2007, Act 40 of 2017, and Act 114 of 2020—but because these amendments are codified within the same sections of Title 73, they act as a single integrated structure rather than as freestanding laws. Understanding how these Acts work together therefore requires attention to how each successive amendment modified, supplemented, or overrode the original statutory text through "notwithstanding" clauses that carve exceptions from the AEPS Act's general geographic framework.

30. The AEPS Act requires Pennsylvania electric distribution companies ("EDCs") and electric generation suppliers ("EGSs") to obtain

prescribed percentages of their retail electricity sales from qualifying alternative energy resources.

31. Section 2 of the Act, codified at 73 P.S. § 1648.2, defines the qualifying resources, which are divided into two tiers. Tier I includes wind, solar photovoltaic, low-impact hydropower, biomass, geothermal, fuel cells, and certain other resources. Tier II includes waste coal, large-scale hydropower, municipal solid waste, distributed generation, demand-side management, and certain other resources.

32. Section 3, codified at 73 P.S. § 1648.3, sets forth the compliance schedule. For reporting years after May 31, 2021, the schedule requires 8% Tier I (including a 0.5% solar PV carveout) and 10% Tier II—meaning that 18% of all retail electricity sold in Pennsylvania must come from, or be offset by credits from, qualifying alternative energy sources. *See* 73 P.S. § 1648.3(b), (c).

33. To verify compliance, the AEPS Act uses alternative energy credits ("AECs"), each representing "one megawatt hour of electricity from an alternative energy source." 73 P.S. § 1648.2. AECs may be "self-generated" or "purchased." *Id*. As originally enacted and as amended by

Act 35 of 2007, Section 2 of the AEPS Act defined eligible alternative energy sources by reference to the PJM.

34. But at that time, unlike now, there was no limitation to Pennsylvania-sited facilities. The original statute provided that an "alternative energy source" included any facility using a qualifying resource "located within the service territory of an electric distribution company . . . or within the service territory of a regional transmission organization that manages the transmission system in any part of this Commonwealth." 73 P.S. § 1648.4 (2004). Because PJM's territory spans thirteen states and the District of Columbia, this language opened the AEPS credit market to generators throughout the PJM footprint, including generators in West Virginia. West Virginia was part of this market from the beginning.

35. The AEPS Act's general geographic framework allowing credits from generators throughout PJM remains operative for Tier I (non-solar) compliance. EDCs and EGSs "may continue to obtain Tier I AECs from anywhere within the PJM region to use for their respective AEPS obligations." Pa. Pub. Util. Comm'n, AEPS Annual Report (2025),

at 36, https://pennaeps.com/wp-content/uploads/2026/04/aeps-2025-report_2-5-25_final_-1.pdf.

36. But, as explained below, Act 40 and Act 114's "notwithstanding" clauses intentionally carved out the two largest credit categories—representing 10.5% of the 18% total obligation—restricting them to in-state resources only.

### D. Pennsylvania's Legislature Decided to "Close the Borders" to Solar Renewable Energy Credits

37. In 2017, Pennsylvania first closed its borders to interstate competition in the AEC market by enacting Act 40 (2017), which amended Section 2 of the AEPS Act (73 P.S. § 1648.2) by adding a new subsection governing solar photovoltaic eligibility.

38. The sponsors of Act 40—Republican Senators Mario Scavello and David Argall—made the protectionist purpose explicit. Their co-sponsorship memorandum stated that the amendment's objective was to "close the borders" to outside solar photovoltaic generation in order to "protect[] Pennsylvania-based solar," copying what other states had done. *See* Co-Sponsorship Mem., Sens. Mario Scavello & David Argall, Solar Energy Credits Legislation (2016).

39. The 2004 AEPS Act had historically permitted solar owners throughout the PJM Interconnection to claim Pennsylvania's SREC—a regime that Act 40's supporters, agreeing with the sponsors, described as resulting in "an oversupply of SRECs (the majority from out-of-state systems), a loss of investment in Pennsylvania's solar market, and to other states getting solar jobs that should have been created in Pennsylvania."[13]

40. Act 40 used a "notwithstanding" clause to override the AEPS Act's general geographic framework. Specifically, Act 40 inserted language providing that, "[n]otwithstanding" the existing geographic eligibility provisions—which permitted credits from any qualifying facility within PJM's service territory—solar photovoltaic resources must satisfy one of several criteria that each require physical presence in Pennsylvania. 73 P.S. § 1648.2 (as amended by Act 40 of 2017).

[13] Stanton Comments re: Implementation of Act 40 of 2017 — Solar Renewable Energy Credits, Pennsylvania Public Utility Commission, Docket No. M-2017-2631527, https://www.puc.pa.gov/pcdocs/1549824.pdf.

41. Specifically, under Act 40, to qualify for solar renewable energy credits ("SRECs"), each solar photovoltaic system must do one of the following:

a. Be directly connected to an electric cooperative or municipal electric system operating within Pennsylvania;
b. Be located within a Pennsylvania electricity distribution company's service territory; or
c. Connect directly to the electric transmission system at a location within the service territory of an electricity distribution company operating within Pennsylvania.

71 P.S. § 714 (as amended by Act 40 of 2017).

42. Those provisions effectively mandate physical presence in Pennsylvania. A solar facility located in West Virginia, even one that delivers electricity onto the same PJM grid and produces the same environmental attributes, cannot satisfy any of these criteria. Out-of-state generators cannot be "directly connected" to Pennsylvania cooperatives. They are not located "within the service territory" of a Pennsylvania distribution company. The Act's "notwithstanding"

structure makes this exclusion absolute: the general PJM-wide eligibility that the original AEPS Act provided is expressly overridden for solar.

43. The PUC approved a Final Implementation Order for Act 40 at Docket No. M-2017-2631527, entered May 3, 2018 (published in the Pennsylvania Bulletin on April 19, 2019).

44. Under the AEPS Act's regulatory framework, the PUC is "responsible for carrying out and enforcing the provisions of the law." 73 P.S. § 1648.7(a).

45. In its Tentative Implementation Order, which it later adopted, the PUC interpreted Act 40 to "exclude solar PV sources located outside of Pennsylvania from qualifying as an AES eligible to generate power and solar renewable alternative energy portfolio credits."[14]

46. As PUC Chairman Gladys M. Brown and Vice Chairman Andrew G. Place observed in a joint statement incorporated into the

---

[14] Implementation of Act 40 of 2017, Tentative Implementation Order, Docket No. M-2017-2631527 (Pa. PUC Jan. 4, 2018), published at 48 Pa.B. 35 (Jan. 6, 2018), https://www.pacodeandbulletin.gov/Display/pabull?file=/secure/pabulletin/data/vol48/48-1/35.html; Implementation of Act 40 of 2017, Docket No. M-2017-2631527, Final Implementation Order at 5 (May 3, 2018).

Final Implementation Order, Act 40 was intended to "close the borders" of Pennsylvania and "foster economic development in the state." *Id.* at 1.

### E. Pennsylvania's Legislature Decided to "Close the Borders" to Tier II AECs

47. The 2017 amendment was a blueprint for further restrictions. In June 2020, Pennsylvania's Joint Legislative Conservation Committee released a report recommending that Tier II AEC participation be limited to in-state resources. The stated goal: increase the value of Tier II AECs by eliminating out-of-state competition.

48. That same month, Republican Senator David Argall and Democratic Senator Lisa Boscola introduced a bill called "Closing Tier II Border." Co-Sponsorship Memorandum, Sen. David Argall & Sen. Lisa Boscola, Closing Tier II Border (June 2020). The sponsors wrote: "We will soon introduce legislation to limit participation in Tier II of the Pennsylvania Alternative Energy Portfolio Standards (AEPS) program to energy sources originating in Pennsylvania." *Id.*

49. The sponsors explained that the AEPS Act was "developed to provide economic development opportunities by increasing alternative electricity generation in Pennsylvania," but that an "oversupply of available credits from outside of Pennsylvania" was "depress[ing] the

value of Tier II AECs and limit[ing] the ability of the AEPS program to adequately support Tier II resources located within our state." *Id.*

50. They made their purpose unmistakable: to "support jobs and alternative energy production within our own state borders and stop ratepayer dollars from continuing to flow to out-of-state resources." *Id.*

51. The sponsors acknowledged that while "Pennsylvania is a net electricity exporter, our ratepayers are currently subsidizing out-of-state energy facilities, including utility owned resources in other PJM states." *Id.* They warned that out-of-state supply "leads to an oversupply of available credits from outside of Pennsylvania which in turn depresses the value of Tier II AECs." *Id.*

52. The sponsors further noted that "four waste coal reclamation-to-energy facilities have closed in the past two years" and that the industry provided "$37 million in annual environmental and public use benefits while supporting 3,000 jobs and $615 million in annual economic benefits in Pennsylvania." *Id.* The solution, in their view, was not to compete—but to eliminate the competition.

53. Senator Argall later described Act 114 on his own legislative accomplishments page as legislation that "limits participation in Tier II

of the Pennsylvania Alternative Energy Portfolio Standards (AEPS) program to energy sources originating in Pennsylvania in order to assist in-state producers." Legislative Accomplishments, Sen. David G. Argall, https://www.senatorargall.com/legislative-accomplishments/.

54. Act 114 employed the same "notwithstanding" structure as Act 40. It provided that, "[n]otwithstanding" the general geographic provisions that allow EDCs and EGSs to satisfy their obligations with credits from resources throughout the PJM region, all Tier II resources must meet one of four eligibility criteria that each require physical presence in Pennsylvania. 72 P.S. § 1799.10-E (as amended by Act 114 of 2020).

55. As with Act 40, the "notwithstanding" clause is the operative mechanism: it carves Tier II out of the AEPS Act's PJM-wide market and restricts it to Pennsylvania-only resources, while leaving broader Tier I (non-solar) credits still available from across PJM. The eligibility criteria are:

a. Directly deliver electricity to a retail customer or to the distribution system of a Pennsylvania electricity distribution company;

b. Be directly connected to an electric cooperative or municipal electric system operating within Pennsylvania;
c. Connect directly to the electric transmission system at a location within the service territory of an electricity distribution company operating in Pennsylvania; or
d. Generate electricity at a generation unit whose operation is subject to permitting by Pennsylvania's Department of Environmental Protection.

72 P.S. § 1799.10-E(a) (as amended by Act 114 of 2020).

56. Those provisions effectively mandate physical presence in Pennsylvania. A Tier II AES facility located in West Virginia, even one that delivers electricity onto the same PJM grid and produces the same environmental attributes, cannot satisfy any of these criteria. Out-of-state generators cannot be "directly connected" to Pennsylvania cooperatives. They are not located "within the service territory" of a Pennsylvania distribution company. And they do not hold permits from the Pennsylvania Department of Environmental Protection. The Act's "notwithstanding" structure makes this exclusion absolute: the general

PJM-wide eligibility that the original AEPS Act provided is expressly overridden for Tier II resources.

57. The PUC's Final Implementation Order for Act 114, issued at Docket No. M-2020-3023323 on May 6, 2021, interpreted Act 114's eligibility criteria and established binding compliance rules for the market.

58. The PUC order interpreted Act 114's "direct" delivery and connection requirements to mean "physical" delivery and connection—the most restrictive reading available—confirming that no generator located outside Pennsylvania's borders can qualify for Tier II status regardless of whether its electricity flows across PJM's integrated transmission grid into Pennsylvania. Implementation of Act 114 of 2020, Docket No. M-2020-3023323, Final Implementation Order at 12 (May 6, 2021) (emphasis added).

59. The order favorably noted the Legislature's comment: "With respect to how banked AECs from out-of-state Tier II AESs will be categorized and permitted to fulfill the AEPS Tier II requirement, the intent of Act 114 is that out-of-state AESs will no longer qualify to meet

the compliance requirements of Tier II of the AEPS." *Id.* at 21 (emphasis added).

60. During the comment period, Senator Argall submitted a letter to the PUC stating that Act 114's purpose was "to ensure that Pennsylvania electric distributors will purchase their Tier II credits from within the Commonwealth." Letter from Sen. David Argall to Pa. Pub. Util. Comm'n, Docket No. M-2020-3023323, at 1 (Feb. 2021). He urged the PUC to "issue a final order . . . to fulfill the legislative intent of closing the [Alternative Energy Portfolio Standards] Tier II border." *Id.* at 2.

61. Argall wrote that "closing borders" to out-of-state Tier II resources "ensures that our in-state ratepayers are supporting jobs, investment, and tax revenue here in Pennsylvania." *Id.* at 2. Representative Doyle Heffley submitted a largely identical letter. *See* Letter from Rep. Doyle Heffley to Pa. Pub. Util. Comm'n, Docket No. M-2020-3023323 (Feb. 2021).

62. The PUC obliged. Its final order stated: "With the passage of Act 114 of 2020, [electricity generation and distribution companies] are required to meet their Tier II obligations by using AECs from Tier II resources located within Pennsylvania." Implementation of Act 114 of

2020, Docket No. M-2020-3023323, Final Implementation Order at 18 (May 6, 2021).

63. This interpretation confirmed what the legislative history made clear—that the Act operates as an absolute bar to out-of-state participation in the Tier II market.

64. And, if there were any remaining doubt, a Pennsylvania Commonwealth Court recently interpreted Act 40 to allow an in-state photovoltaic system to qualify to sell alternative energy credits under the AEPS Act, even though the system did not connect to the grid and sold directly to retail customers. *Williams Companies, Inc. v. Pa. Pub. Util. Comm'n*, ___ A.3d ___ (Pa. Commw. Ct. Aug. 19, 2026), slip op. Relevant here, both the majority and dissent agreed that "[t]he legislative history of Act 40 reflects an intent to promote in-state solar development *and prevent out-of-state solar projects from qualifying for Pennsylvania credits*." *Id.* at 11 (emphasis added); *id.* at 5 (Jubelirer, J., dissenting) ("As the Majority observes, Act 40 'imposes stricter geographic qualifications for solar photovoltaic systems,' intending 'to promote in-state solar development and prevent out-of-state solar projects from qualifying for Pennsylvania credits.'").

### F. The Acts Have Accomplished Their Protectionist Goals

65. Before Act 40's passage, most solar renewable energy credits claimed in Pennsylvania came from out-of-state systems within the PJM. The PUC's own annual reports document the sea change. In reporting year 2017, only 39% of Solar AECs retired for compliance originated in Pennsylvania; 61% came from out-of-state PJM generators. Pa. Pub. Util. Comm'n, AEPS Annual Report (2017), at 8, https://www.puc.pa.gov/electric/pdf/AEPS/AEPS_Ann_Rpt_2017.pdf.

66. The Act's sponsors acknowledged this, describing their perception that "Pennsylvania remains at a competitive disadvantage [in solar energy] when compared to our neighboring states," and their intent in response to require "[e]lectric distributors . . . to purchase their credits from within the Commonwealth, thereby limiting the available supply of these SRECs." Co-Sponsorship Mem., Sens. Mario Scavello & David Argall, Solar Energy Credits Legislation (2016).

67. Chart 2 in the PUC's 2025 annual report, reproduced below, tracks the systematic expulsion of out-of-state resources from the market since Act 40 took effect.




68. As Chart 2 demonstrates, the percentage of Solar AECs originating in Pennsylvania quickly approached 100% as legacy contracts expired: 35% in 2018, 35% in 2019, 50% in 2020, 78% in 2021, 93% in 2022, 98% in 2023, 98% in 2024, and 99% in 2025. *See* Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 9.

69. The PUC's 2025 report observes that this trend has "reversed sharply and soon will reach 100%." Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 9. West Virginia and all other PJM-state solar producers have been shut out entirely.

70. The Tier II market tells the same story of deliberate exclusion, documented year by year in the PUC's own publications. In 2020,

immediately before Act 114 took effect, the PUC reported that approximately 59.8% of Tier II credits came from Pennsylvania-based resources and approximately 40.2% came from out-of-state generators within the PJM Interconnection. Pa. Pub. Util. Comm'n, AEPS Annual Report (2020), at 3, https://www.puc.pa.gov/media/1410/aeps-annreport2020.pdf. West Virginia alone supplied 6.2% of all Tier II credits retired for compliance in 2021. Pa. Pub. Util. Comm'n, AEPS Annual Report (2021), at 59 (Table 4), https://www.puc.pa.gov/media/1843/aeps-2021-report-030822.pdf.

71. But by 2022, the Pennsylvania share had risen to 64.7%. By 2023, 90%. By 2024, 97%. And by 2025, the PUC reports that 100% of Tier II AECs retired for compliance originated in Pennsylvania—zero from out-of-state. Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 5. The PUC's own Chart 1 shows the stark elimination:

Chart 1: Percentage of AECs Retired in 2020




*Note: Total may not add up to 100% because states supplying less than 3% of credits in any category are not shown and due to rounding.*

Chart 1: Percentage of AECs Retired in 2025




***Note:*** *Total may not add up to 100% because states supplying less than 2% of credits in any category are not shown and due to rounding.*

## G. The Acts Have Harmed Pennsylvanians

72. A June 2026 Commonwealth Foundation report concluded that since AEPS mandates took effect, Pennsylvania ratepayers have paid more than $3.3 billion in cumulative compliance costs, with annual

compliance costs rising from $122.5 million in reporting year 2020 to over $700 million annually in reporting years 2024 and 2025.[15]

73. The PUC's own 2025 AEPS report documents that purchased-credit compliance costs totaled $701,874,446.14 in reporting year 2025, including $22,665,654.17 for solar, $311,614,124.87 for Tier I, and $367,594,667.10 for Tier II. Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 13.

74. The trajectory is staggering. Tier II compliance costs exploded from just $3.6 million in 2020 to $78.4 million in 2021, to $148 million in 2022, to $250.7 million in 2023, and finally to $367.6 million in 2025. Pa. Pub. Util. Comm'n, AEPS Annual Reports (2020–2025). This is the direct and foreseeable consequence of eliminating interstate competition, leaving ratepayers holding the bag.

75. The PUC's 2025 AEPS report describes the Tier II price increase as "meteoric." The report states: "With the passage of the Act 114 of 2020, the weighted average credit prices used for Tier II

---

[15] Commonwealth Found., *The Rising Cost of Pennsylvania's Alternative Energy Portfolio Standards* (June 16, 2026), https://commonwealthfoundation.org/research/the-rising-cost-of-pennsylvanias-alternative-energy-portfolio-standards/.

compliance have risen from an historic low of roughly $0.10 to more than $26. The fact that most of the AEPS compliance obligation must be sourced from Tier II resources, coupled with this meteoric increase in Tier II AEC pricing, has resulted in substantial compliance costs for the AEPS." Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 15.

76. Chart 5 of the report shows the resulting explosion in reported purchased-credit compliance costs.[16]

Chart 5: Reported Cost of AECs by Reporting Year (ending in)




[16] Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 15.

77. The Commonwealth Foundation report confirms that AEPS annual compliance costs quadrupled from 2020 to 2025, while "fail[ing] to produce a renewable generation buildout" and leaving "Pennsylvania's share of electricity generation from renewables between 2013 and 2024 . . . flat at approximately 4 percent." The report further found that Pennsylvania's border-closing mandates transfer "ratepayer dollars to a concentrated set of AEC-eligible generators while the electricity grid faces tightening supply."[17]

78. The PUC itself projects a "likely shortfall in the supply of available Tier II credits beginning in 2028," Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 36. That means that Act 114's geographic restrictions are not merely driving up prices today but are on course to make compliance physically impossible in the near future, potentially triggering automatic penalty payments that will be passed directly through to ratepayers.

79. By contrast, Pennsylvania's in-state renewable electricity generation has remained roughly flat as a share of statewide generation, demonstrating that Act 114 did not create new energy, but merely

---

[17] Commonwealth Found., *supra* n.15.

eliminated competition. The PUC's 2025 report states that in 2024, "approximately 4% of the state's electricity generation was from renewable energy sources," and acknowledges that "Pennsylvania's AEPS requirements . . . have not kept pace as compared to the requirements of other states with portfolio standards." Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 22–24 & Chart 9.

80. Meanwhile, waste coal alone accounted for 50.5% of Tier II AECs retired in 2025, followed by pumped storage hydropower at 24.5% and conventional hydropower at 11.6%. *Id.* at 12. Energy efficiency—the only "new" resource category—accounted for a mere 0.5% of Tier II AECs. *Id.* Act 114 did not spur innovation or create new clean energy. It enriched a handful of existing Pennsylvania generators at the expense of every ratepayer in the Commonwealth.

81. The rising costs are not limited to compliance charges. Because RPS mandates and renewable energy credits act as a tax on unsubsidized conventional generators, they drive those generators out of the market, decreasing overall supply and raising wholesale electricity prices.

82. In PJM, coal-fired generating capacity has decreased by approximately 25% since 2019—from 52,500 megawatts to 38,850 megawatts—while summer peak load has increased by over 6,300 megawatts and winter peak load has surged by over 23,000 megawatts, an increase of almost 20%. The withdrawal of conventional generation caused PJM capacity market prices to increase tenfold, from approximately $29 per megawatt-day to nearly $330 per megawatt-day.[18]

83. Energy industry and market sources have recognized the same market mechanics. One energy-market analysis found that renewable portfolio standard mandates cost U.S. retail electricity customers more than $114 billion from 2020 through 2025, with the largest percentage effects in states that require in-state generation. The analysis further concluded that those mandates distort competitive markets by driving out conventional generators and increasing reliability

[18] *See* Ethan Howland, *PJM Capacity Prices Set Another Record with 22% Jump*, Utility Dive (July 23, 2025), https://www.utilitydive.com/news/pjm-interconnection-capacity-auction-prices/753798/.

costs, while producing negligible emissions benefits and contributing to an estimated 130,000 job losses in 2024 alone.[19]

84. Recent reporting recognizes that RPS mandates—particularly those conditioned on in-state generation—drive up consumer costs and warrant reassessment in light of energy affordability challenges in Pennsylvania and elsewhere.[20]

85. Most tellingly, in its most recent AEPS Report, Defendant PUC itself has recommended that the General Assembly amend Act 114 to remove the Tier II geographic restrictions, a remarkable admission that its own regulatory scheme is causing unjustifiable harm:

> The average price for Tier II credits in 2020 was $1.92 per credit, resulting in a total Tier II compliance cost of $3.6 million. In comparison, in 2025, the average price per Tier II credit was $26.92, resulting in a total Tier II compliance cost of over $367 million.

---

[19] *See* Jonathan Lesser, *Renewable Portfolio Standards & Electricity Prices*¸ Nat'l Center for Energy Analytics (July 1, 2026), https://energyanalytics.org/research/renewable-portfolio-standards-electricity-prices.

[20] Dane Berhart, *Re-Assessing RPS Critical To Address Energy Affordability Challenges*, Forbes (Aug. 11, 2026), https://www.forbes.com/sites/daneberhart/2026/08/11/re-assessing-rps-critical-to-address-energy-affordability-challenges/; *see also Pennsylvania Energy Choice High Bills*, Daily Signal (Aug. 3, 2026), https://www.dailysignal.com/2026/08/03/pennsylvania-energy-choice-high-bills/.

> With electric demand increasing, the number of necessary AECs for Tier II compliance will increase in response. This will likely tighten the supply and demand profile for Tier II credits, ***resulting in even further price increases***.
>
> Given this increase in demand and other factors affecting wholesale prices, a reassessment of Act 114 is appropriate. The Commission believes this issue could be addressed by revising Tier II resource qualification criteria, such as adding new resources or ***amending geographic qualifications***.[21]

### H. West Virginia's Producers, Ratepayers, and Treasury Have Been Directly Harmed

86. Without the ability to sell into Pennsylvania and other states with similar laws, West Virginia's solar producers can only sell AECs on the low-rate "voluntary market," hovering around a few dollars per MWh driven by consumers who choose to procure renewable electricity beyond what policy requires.[22]

87. West Virginia's Tier II resources fare worse still: conventional hydroelectric and waste coal credits have essentially no voluntary market value, because the voluntary REC market is organized around certified renewable or green-power attributes, with eligible resources limited to

---

[21] Pa. Pub. Util. Comm'n, AEPS Annual Report (2025), at 47 (emphases added).

[22] Env't. Prot. Agency, *Green Power Pricing*, https://www.epa.gov/green-power-markets/green-power-pricing (last updated Feb. 26, 2026).

categories such as wind, solar, and geothermal.[23] For West Virginia's hydroelectric and waste coal generators, the Pennsylvania market that Act 114 closed was practically the only viable market.

88. West Virginia possesses substantial eligible generation that is locked out of the Pennsylvania market solely because of Acts 40 and 114. This includes over a million megawatt hours per year from conventional hydroelectric facilities documented in federal generation data—Hawks Nest, Glen Ferris, Summersville, Willow Island, Winfield, London, Marmet, New Martinsville, Belleville, and others[24]—and the Grant Town waste coal plant in Marion County generated 640,178 megawatt hours in 2024, its last full year of federally reported output.[25] Act 114 closed Grant Town's natural market in Pennsylvania while the

---

[23] Env't. Prot. Agency, *Join the Green Power Partnership,* https://www.epa.gov/green-power-markets/green-power-pricing (last accessed Aug. 10, 2026).

[24] *See* U.S. Energy Info. Admin., W. Va. (Mar. 19, 2026), https://www.eia.gov/states/WV/analysis.

[25] Public Service Commission of W. Va, *Ambit Price Comparison: Grant Town Power Plant*, https://www.psc.state.wv.us/scripts/WebDocket/ViewDocument.cfm?CaseActivityID=431653&NotType=%27WebDocket%27 (last accessed Aug. 10, 2026).

plant was operating and struggling, and access to that market is a condition of any restart.[26]

89. West Virginia also possesses a growing solar generation fleet. West Virginia's own solar statute, Senate Bill 583 of 2020, authorizes each of the State's electric utilities to develop up to 200 megawatts of utility-scale solar, and the utilities' integrated resource plans now before the West Virginia Public Service Commission include solar additions in every scenario. Together with the State's independent utility-scale projects and its rooftop and distributed fleet, documented in the United States Energy Information Administration's own data, West Virginia's solar generation will exceed Pennsylvania's entire annual solar credit requirement by 2028.

90. But Act 40 blocks these solar producers from selling Tier I solar credits into Pennsylvania's SREC market, where credits averaged $33.20 per megawatt-hour in the most recent compliance year according to the Commission's own annual report, against a solar compliance

[26] Sonal Patel, *A Coal Refuse Power Plant Is Pioneering an AI-Driven Overhaul*, IIOT Power (Dec. 19, 2023), https://www.powermag.com/a-coal-refuse-power-plant-is-pioneering-an-ai-driven-overhaul/.

ceiling of $66.40, compared to the approximately $2 per megawatt-hour West Virginia solar producers receive in voluntary markets.

91. Absent Act 114, these producers would sell credits into Pennsylvania's Tier II market, in which, by the Commission's own account, prices have risen sharply from lows of twenty-five cents to current prices over $30 per megawatt-hour—with spot prices averaging $36.43 and a weighted average of $26.92 in the most recent compliance year. Because of Pennsylvania's reported supply shortfall, prices are heading toward $45.

92. Meeting that demand would both generate substantial revenues, jobs, and tax receipts for West Virginia and put downward pressure on spiraling Pennsylvania energy prices. Act 114 forecloses this interstate commerce safety valve entirely.

93. West Virginia generators have already suffered substantial historic harm. From Act 40's first full year in 2018 through 2025, and from Act 114's first affected compliance year in 2021 through 2025, West Virginia generators lost approximately $95 million in revenues due to the border lockout, more than $110 million with prejudgment interest at the

published statutory rate of 6.25 percent. In 2024 alone, the loss exceeded $31 million.

94. Tier II losses are valued at the weighted average credit prices the Commission's own annual report documents for each year of the lockout, from $5.76 in 2021 to $26.92 in 2025, and the figure remains understated: it claims nothing for hydroelectric facilities. Further, Tier I solar losses are calculated below the $33.20 weighted average the Commission's own report documents. Even assuming those prices could deflate upon full competition, the losses are still conservative estimates. And these losses will accelerate as West Virginia's solar fleet expands under Senate Bill 583 and as Pennsylvania's AEPS obligations continue to grow.

95. **Generator Harm.** Going forward, West Virginia generators face more than $620 million in lost revenues over ten years, and more than $895 million including the Grant Town plant. Including Grant Town, the annual loss runs from more than $76 million in 2026 to more than $91 million by 2035. The largest component is Tier II: West Virginia's hydroelectric fleet loses more than $425 million at the prices Pennsylvania's own supply shortfall is producing, measured net of the

value those facilities can earn elsewhere, and the Hawks Nest plant, which has no alternative credit market of any kind, loses more than $160 million by itself.

96. At least ten distinct West Virginia power-generating entities are harmed by Acts 40 and 114. These include Berkshire Hathaway Energy (Ravenswood solar facility), Horus WV 1 LLC/Blake (Opdenergy/Antin solar), rooftop and distributed solar owners, American Bituminous Power Partners (Grant Town waste coal plant), Brookfield Renewable (Hawks Nest and Glen Ferris hydroelectric), Gauley River Power Partners (Summersville hydroelectric), American Municipal Power (Willow Island hydroelectric), Appalachian Power (Winfield, London, and Marmet hydroelectric), the City of New Martinsville (hydroelectric), and other utility-scale solar developers entering the market under Senate Bill 583.

97. Those generators include West Virginia municipalities with hydroelectric facilities, such as the City of New Martinsville, Summersville/Gauley River Power Partners, and AMP/Willow Island.

98. **Ratepayer Harm.** West Virginia is a fully regulated, vertically integrated electricity market: when its utilities sell renewable

energy credits, the proceeds are credited back to customers through docketed rate mechanisms, not hypothetical ones. Because Acts 40 and 114 exclude West Virginia generation from Pennsylvania's markets, more than $120 million in credit revenue that would offset West Virginians' electric bills over the next decade is lost: more than $95 million on the utilities' solar fleets and more than $24 million on Appalachian Power's own hydroelectric plants. West Virginia households and small businesses that own their own solar systems separately lose more than $36 million, and municipalities that own hydroelectric generation lose Tier II revenues outright; the City of New Martinsville alone loses more than $48 million over the decade.

99. **State Fiscal Harm.** Based on historical energy production, current REC prices on the PJM, and current in-state tax rates, West Virginia's treasury will likely suffer about $50 million in lost tax revenues over ten years. Most of it, approximately $32 million, is property tax and related revenue on solar investment that Pennsylvania's closed border deters, and county school boards hold the largest levies on that property. The remainder is income tax and sales

tax on the credit revenue and spending that open borders would generate. Act 114 eliminates that activity entirely.

## CAUSES OF ACTION

### Count I – Violation of the Dormant Commerce Clause

*(Act 40 (2017))*

100. West Virginia re-alleges the facts above and incorporates them herein by reference.

101. The Dormant Commerce Clause prohibits state laws that "clearly discriminate" against out-of-state commerce. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). A discriminatory law is "virtually *per se* invalid." *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994).

102. Wholesale electricity flows between states are quintessentially interstate commerce. *Transource Penn., LLC v. DeFrank*, 156 F.4th 351, 358 (3d Cir. 2025).

103. Act 40 is facially discriminatory. It conditions eligibility for Pennsylvania Tier I solar renewable energy credits on in-state location, in-state service-territory connection, or direct connection to Pennsylvania electric systems. *See* 71 P.S. § 714. Those eligibility criteria, on their face

and as interpreted and implemented by PUC, exclude otherwise eligible out-of-state PJM solar resources from Pennsylvania's SREC market.

104. Even if Act 40 were not facially discriminatory, it violates the Commerce Clause because it was enacted and implemented for a discriminatory purpose and has a discriminatory practical effect.

105. Act 40 was enacted for the express purpose of closing Pennsylvania's solar renewable energy credit market to out-of-state competition. Its sponsors stated that the objective was to "close the borders" to outside solar photovoltaic generation and "protect Pennsylvania-based solar." The PUC's implementation order confirmed that Act 40 closed Pennsylvania's SREC market to out-of-state resources.

106. Act 40 is unconstitutional under the *Pike* balancing test as well. A state law that "imposes a burden on interstate commerce" that is "clearly excessive in relation to the putative local benefits" violates the Commerce Clause. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

107. Act 40 imposes a severe burden on interstate commerce by excluding otherwise eligible out-of-state solar resources from Pennsylvania's SREC market. It blocks West Virginia solar resources

from sale into a market where credits could receive substantially higher prices than in voluntary markets.

108. The burden is substantial. West Virginia generators, ratepayers, and the State treasury face significant lost revenues, lost ratepayer savings, and lost tax receipts because Act 40 forecloses interstate alternative energy credit transactions that would otherwise occur through the PJM region.

109. The putative local benefits are minimal or nonexistent. Act 40 does not create materially greater environmental benefits than would be achieved by allowing otherwise eligible out-of-state PJM resources to participate on equal terms. Instead, Act 40 protects in-state generators from interstate competition, failed to drive an expansion in in-state solar AES generation, and has drastically increased costs to Pennsylvania ratepayers by restricting supply while demand grew.

**Count II – Violation of the Dormant Commerce Clause**

*(Act 114 (2020))*

110. Act 114 is facially discriminatory. It conditions eligibility for Pennsylvania Tier II alternative energy credits on direct delivery to Pennsylvania customers or distribution systems, direct connection to Pennsylvania electric systems, connection to the transmission system

within a Pennsylvania distribution-company service territory, or operation under Pennsylvania permitting authority.

111. Those criteria, on their face and as interpreted and implemented by PUC, impose an express in-state presence requirement and exclude otherwise eligible out-of-state PJM Tier II resources from Pennsylvania's AEC market. *See* 72 P.S. § 1799.10-E. Act 114 imposes a severe burden on interstate commerce by excluding otherwise eligible out-of-state Tier II resources from Pennsylvania's AEC market. It bars West Virginia hydroelectric and waste-coal producers from selling Tier II credits into Pennsylvania solely because they are located outside Pennsylvania.

112. Even if Act 114 were not facially discriminatory, it violates the Commerce Clause because it was enacted and implemented for a discriminatory purpose and has a discriminatory practical effect.

113. Act 114 was enacted for the same protectionist purpose as Act 40. Its sponsors titled the proposal "Closing Tier II Border," stated that the legislation would limit Tier II participation to energy sources originating in Pennsylvania, and explained that the law would stop Pennsylvania ratepayer dollars from flowing to out-of-state resources.

The PUC's implementation order confirmed that Pennsylvania electricity generation and distribution companies must meet their Tier II obligations using AECs from Tier II resources located within Pennsylvania.

114. Act 114 is unconstitutional under the *Pike* balancing test as well. A state law that "imposes a burden on interstate commerce" that is "clearly excessive in relation to the putative local benefits" violates the Commerce Clause. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

115. Act 114 has caused out-of-state Tier II credits to plummet from approximately 40.2% of Pennsylvania's Tier II market to approximately 3%, with the remaining share expected to reach zero as pre-Act 114 contracts expire.

116. The burden is substantial. West Virginia generators, ratepayers, and the State treasury face significant lost revenues, lost ratepayer savings, and lost tax receipts because Act 114 forecloses interstate alternative energy credit transactions that would otherwise occur through the PJM region.

117. The putative local benefits are minimal or nonexistent. Act 114 does not create materially greater environmental benefits than

would be achieved by allowing otherwise eligible out-of-state PJM resources to participate on equal terms. Instead, Act 114 protects in-state generators from interstate competition, failed to drive an expansion in in-state Tier II AES generation, and has drastically increased costs to Pennsylvania ratepayers by restricting supply while demand grew.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of the State of West Virginia and against Defendants, and grant the following relief:

1. Declare that the geographic eligibility restrictions imposed by Act 40 of 2017, codified in 71 P.S. § 714, as applied to Tier I solar photovoltaic resources and solar renewable energy credits, violate the Commerce Clause of the United States Constitution to the extent they exclude otherwise eligible out-of-state PJM resources from Pennsylvania's SREC market based on location, physical connection, service-territory connection, or other in-state presence requirements;
2. Declare that the PUC's Final Implementation Order for Act 40 at Docket No. M-2017-2631527 violates the Commerce

Clause of the United States Constitution to the extent it implements, interprets, or enforces those geographic eligibility restrictions against otherwise eligible out-of-state PJM resources;

3. Declare that the geographic eligibility restrictions imposed by Act 114 of 2020, codified in 72 P.S. § 1799.10-E, as applied to Tier II alternative energy resources and alternative energy credits, violate the Commerce Clause of the United States Constitution to the extent they exclude otherwise eligible out-of-state PJM resources from Pennsylvania's Tier II AEC market based on location, direct delivery, physical connection, service-territory connection, Pennsylvania permitting, or other in-state presence requirements;

4. Declare that the PUC's Final Implementation Order for Act 114 at Docket No. M-2020-3023323 violates the Commerce Clause of the United States Constitution to the extent it implements, interprets, or enforces those geographic eligibility restrictions against otherwise eligible out-of-state PJM resources;

5. Permanently enjoin Defendants, their officers, agents, servants, employees, successors, and all persons in active concert or participation with them from implementing or enforcing the geographic eligibility restrictions imposed by Act 40, Act 114, and the PUC implementation orders in a manner that excludes otherwise eligible out-of-state PJM resources from participating in Pennsylvania's SREC or Tier II AEC markets on equal terms with comparable Pennsylvania resources;

6. Order Defendants to recognize otherwise eligible out-of-state PJM resources as eligible to create, transfer, sell, and be used for compliance with Pennsylvania SRECs and Tier II AECs on the same terms as comparable in-state resources, without regard to the resource's out-of-state location, out-of-state physical connection, or absence of Pennsylvania-specific permitting, except to the extent a nondiscriminatory eligibility requirement applies equally to in-state and out-of-state resources;

7. Award Plaintiff its costs and, to the extent authorized by law, attorneys' fees; and

8. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: September 3, 2026


*/s/ Mark I. Pinkert*
Mark I. Pinkert*
David Johnson*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2333 Ponce de Leon Blvd., Suite 600
Coral Gables, FL 33134
mpinkert@holtzmanvogel.com
(305) 379-1601

*/s/ Kathleen A. Gallagher*
Kathleen A. Gallagher
(PA #37950)
The Gallagher Firm, LLC
436 Seventh Avenue
Koppers Building 30th Floor
Pittsburgh, PA 15219
kag@gallagherlawllc.com
(412) 308-5512

John B. McCuskey*
*Attorney General*

Zachary A. Viglianco*
*Director of Strategic Litigation*

Caleb B. David*
*Deputy Solicitor General*

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd. E
WV State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305

*Counsel for the State of West Virginia*


**Pro hac vice* forthcoming